IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NUFEEDS, INC., | : | CIVIL ACTION NO. **3:CV-04-1071** |
| | : | |
| | : | Magistrate Judge Blewitt |
| Plaintiff | : | |
| | : | |
| v. | : | |
| | : | |
| WESTMIN CORP., | : | |
| OUTOKUMPU COPPER, INC., and | : | |
| OUTOKUMPU AMERICAN BRASS, INC., | : | |
| | : | |
| Defendants | : | |
| | : | |

**MEMORANDUM AND ORDER**

**I. Background**.

This breach of contract, breach of implied and express warranties, strict liability and negligence action was commenced on April 14, 2004, by Plaintiff Nufeeds, Inc., ("Nufeeds") against Defendants Westmin Corp., Outokumpu Copper, Inc., and Outokumpu American Brass, Inc.,[1] in the Court of Common Pleas of Susquehanna County, Pennsylvania. (Doc. 23, Ex. A). On May 13, 2004, Defendant American Brass removed this case to this Court pursuant to 28 U.S.C. § 1441. (Doc. 1). The Defendant invoked the diversity jurisdiction of this Court. 28 U.S.C. §1332(a). (Doc. 1, p. 3, ¶ 7.). The parties consented to proceed before a Magistrate Judge 28 U.S.C. §636(c)(1), and the District Court entered an Order reassigning this case to a Magistrate Judge (Doc. 10) for pre-trial and trial purposes.

Defendant American Brass filed an Answer to the Plaintiff's Complaint on May 20, 2004 and

---

[1]The latter two Defendants hereinafter shall jointly be referred to as Defendant "American Brass".

a crossclaim against Defendant Westmin Corp.  (Doc. 4).  Defendant Westmin Corp. filed its Answer to the Complaint on August 23, 2004 and a Crossclaim against American Brass.  (Doc. 12). Discovery then ensued.

On October 3, 2005, American Brass filed a Motion for Summary Judgment. **(Doc. 22).** American Brass also filed a Statement of Material Facts ("SMF") with exhibits and a support Brief. (Docs. 23 & 24).  Both Plaintiff and Defendant Westmin filed Briefs, Responses to American Brass' SMF and exhibits in opposition to American Brass' Summary Judgment Motion.  (Docs. 31, 32, 33, 34, 35, 36, 38, 39 & 46).[2]

As stated, on October 3, 2005, Defendant American Brass filed a Summary Judgment Motion with respect to both Plaintiff's original claims against it and with respect to Defendant Westmin's cross-claims against it.  (Doc. 22).  American Brass argues that the claims against it for negligence and strict liability by both Plaintiff and Westmin[3] are barred by the economic loss doctrine, and that the claims against it for breach of warranty should be dismissed since it did not make any express warranties, it was not the merchant of bag house dust and neither Plaintiff nor Westmin relied upon its judgment in selecting a proper product.  (Doc. 22, p. 1).  Both Plaintiff and Defendant Westmin have opposed American Brass' Summary Judgment Motion.

---

[2]The Court allowed the parties to file supplemental briefs as well as sur-reply briefs.

[3]In Counts I, III and V of its Counterclaim against American Brass, Westmin asserts claims for contribution and/or indemnification for negligence, strict liability, and breaches of implied warranties, respectively. (Doc. 12, pp. 17-23).

## II. Motion for Summary Judgment Standard.

The court may grant a motion for summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits show that there is no genuine issue as to any material fact.   Fed.R.Civ.P. 56(c).   An issue of fact is "`genuine' only if a reasonable jury, considering the evidence presented, could find for the nonmoving party." *Childers v. Joseph*, 842 F.2d 689, 693-694 (3d Cir. 1988) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

The burden of proving that there is no genuine issue of material fact is initially upon the movant.  *Forms, Inc. v. American Standard, Inc.*, 546 F. Supp. 314, 320 (E.D. Pa. 1982), *aff'd mem.* 725 F.2d 667 (3d Cir. 1983).   Upon such a showing, the burden shifts  to the nonmoving party. *Id*.   The nonmoving party is required to go beyond the pleadings and by affidavits or by "depositions, answers to interrogatories and admissions on file" designate "specific facts showing that there is a genuine issue for trial."   Fed.R.Civ.P. 56(e).

In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the nonmoving party.  *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir. 1988).   In doing so, the court must accept the nonmovant's allegations as true and resolve any conflicts in his favor.   *Id*., *quoting Gans v. Mundy*, 762 F.2d 338, 340 (3d Cir. 1985), *cert. denied,* 474 U.S. 1010 (1985); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976) *cert. denied*, 429 U.S. 1038 (1977).

### III. Undisputed Material Facts.

American Brass filed its SMF (Doc. 23) with exhibits, and Plaintiff as well as Defendant Westmin filed their Responses to it.  (Docs. 32, 34, 36).[4]  Plaintiff also filed its own SMF with exhibits, as well as a Supplemental SMF with exhibits (Docs. 35 & 38).  The Court will consider both Plaintiff's original SMF (Doc. 35) and its supplemental SMF (Doc. 38).

At the outset, we agree with Plaintiff's assessment that there are few disputed facts in this case.  (Doc. 33, p. 1).  Indeed, the responses of Plaintiff and Westmin to American Brass' SMF reveal that many facts are admitted.  *See* Doc. 23, ¶'s 1.-11., 13, 14, 15, 16, 20 (only in part by Westmin), 21, 22, 23, 24, 25, 26, 27, 28 (only in part by Westmin), 29, 30 (Plaintiff admits and Westmin denied), 31, 32 (Westmin only admits in part), 33, 34, 36.  *See also* Doc. 32 and Doc. 36 at stated ¶'s.[5]

Since the stated facts are not disputed, we shall not reiterate them entirely herein.  We shall only discuss the relevant material facts for present purposes.

> 11.     American Brass is in the business of manufacturing and selling brass and copper products, primarily sold in coil form.  (*See* Peczkowski Dep., Ex. H, p. 11.).  As part of the brass manufacturing process, copper and zinc are melted and poured into a mold to form a large rectangular "cake" which is then used to make sheets and coils of brass. (*See* Peczkowski Dep., Ex. H, p. 12.).  When the copper and zinc are melted, fumes are generated which contain a

---

[4]Doc. 36 is an identical copy of Doc. 34, except that it contains the proper signature line for Plaintiff's counsel.

[5]Defendant Westmin has only responded to the factual SMF's of American Brass and to the SMF's that relate to its claims, *i.e.* ¶'s 11.-36. of American Brass' SMF.  Doc. 32.  Westmin has also added its own additional disputed facts to its response. Doc. 32, pp. 6-9.

large amount of zinc oxide.  These fumes are collected through an exhaust system which separates out the solid portion of the fumes and collects it in large bags in the form of dust.  The area in which the dust is dropped into these bags is known as the bag house.  As a result, the dust is known as bag house dust. (*See* Bodekor Dep., Ex. K, pgs. 40-43.).

13.  American Brass ships approximately 25 million pounds of finished copper and brass product per month.  It ships approximately 25 thousand to 30 thousand pounds of bag house dust every six weeks. (*See* Peczkowski Dep., Ex. H, p. 67.).

14.  In early 2000, American Brass and Westmin began discussing the possibility of American Brass selling its bag house dust to Westmin.  At that time, Westmin was purchasing bag house dust from PMX Industries, another brass manufacturer, and high purity zinc from Zinc Corporation of America and U.S. Zinc. (*See* Jones Dep., Ex. G, pp. 24-26.).

15.  During discussions with Westmin, American Brass asked Westmin to identify its intended use of the product.  Westmin indicated by letter that the bag house dust would be used in trace mineral premix for the animal feed industry.  *(See* Letter from Roy Orban, dated March7, 2000, attached as **Exhibit L.**).

16.  Westmin also stated that it had used a similar product from Olin Corporation for many years with very good results. (*See* Telecopy from Greg Jones, dated March 1, 2000, attached as **Exhibit M**.  *See also* Jones Dep., Ex. G, p. 25.).

20.  American Brass provided the "analytical" showing the requested metal content. (*See* Telefax transmittal dated February 7, 2000, attached as **Exhibit N**; *see also* Peczkowski Dep., Ex. H, p. 32.).

21.  Prior to dealing with Westmin, American Brass had tested its bag house dust for metals and carbon. (*See* Robinson Dep., Ex. I, pp. 12-13.).  Testing was performed because previous buyers asked about the zinc content of bag house dust. (*See* Peczkowski Dep., Ex. H, p. 25.).

22.  Westmin also asked American Brass to provide a sample of its bag house dust.  Westmin received this sample and sent it out for its own analysis.  Westmin asked its testing lab to test the sample for zinc level and cadmium.  (*See* Jones Dep., Ex. G, pp. 35 and 217; *see also* Orban Letter, Ex. L, p. 3.).

23.  A screening test for the presence of dioxin could have been performed for $400 or $500.  (*See* Jones Dep.,. Ex. G, pp. 111-112.).

24.  After testing the bag house dust for zinc and cadmium, Westmin sent a letter to American Brass enclosing the results of the testing.  Westmin stated in the letter that the bag house dust would be incorporated into pre-mix "depending on analyses." (Orban letter, Ex. L; *see also* Jones Dep. Ex. G, p. 109.).

25.  Over the next two years, American Brass periodically sold truck loads of bag house dust to Westmin, originally for $.03 a pound, then for $.08 a pound, and then ultimately for $.11 a pound. (*See* Peczkowski Dep., Ex.  H, pp. 46-49.).

26.  Each and every time Westmin received a shipment of bag house dust from American Brass, Westmin set it off in a quarantined area, took a representative sample, and sent it out for testing.  According to Greg Jones, this testing was done prior to the use of the bag house dust because "[w]e didn't have any idea what the analysis was going to be on that material." (Jones Dep., Ex. G, pp. 37-38.).

27.  Each shipment was tested by Westmin for its zinc value. Westmin also periodically conducted a "total analysis" of the bag house dust. (Jones Dep., Ex. G, pp. 38-39.).  Westmin performed the same type of test on the PMX bag house dust.  (*See* Jones Dep., Ex. G, p. 40.).

28.  Westmin performed no tests on the zinc provided by Zinc Corporation of America and U.S. Zinc because these companies gave Westmin a "guaranteed analysis" of the product. (*See* Jones Dep., Ex. G, p. 39.).  American Brass did not give a guaranteed analysis, nor was it ever asked to do so.  (*See* Jones Dep., Ex. G, p. 40.).

29.  When testing the bag house dust, Westmin looked for a zinc percentage greater than 60-65%.  If the bag house dust did not have that percentage, Westmin still used the bag house dust in its pre-mix, but only as a flow agent. (Jones Dep., Ex. G, pp. 41-42.).  When using the bag house dust as a zinc additive or a flow agent, Westmin did not treat or change it before adding it to the pre-mix.

30.  Westmin's president, Greg Jones, testified that Westmin did not test the bag house dust for any components other than zinc levels

> and heavy metals because "[a]ll we were concerned about was the zinc
> value, the heavy metals value." (Jones Dep., Ex. G, pp. 44-45.).

(Doc. 23, ¶'s 11., 13, 14, 15, 16, 20 (only in part by Westmin), 21, 22, 23, 24, 25, 26, 27, 28 (only

in part by Westmin), 29, 30 (Plaintiff admits and Westmin denied), 31, 32 (Westmin only admits

in part), 33, 34, 36).[6]

> 9.  Once it [baghouse dust] is collected in the sack, normally
> American Brass will wait until a truckload is accumulated, and then
> American Brass would sell the material to an approved outlet that is
> considered a safe home for the by–product. [Doc. 35] Exhibit "A",
> Peczkowski deposition at page 15.

> 10.  As such, baghouse dust is a by-product of a manufacturing
> or production process at American Brass.  Exhibit "A," Peczkowski
> deposition at page 95, 185, Exhibit "C," Burghardt deposition at page 20.

(Doc. 35, ¶'s 9.-10.).

Defendant American Brass avers that it does not manufacture bag house dust, while Plaintiff

contends that it does.  (Doc. 23, ¶ 12. & Doc. 35, ¶ 12.).  Peczkowski testified that American Brass

does not manufacture bag house dust; rather, it was a by-product.  (Doc. 35, Ex. A, p. 185).

> 16.  American Brass was selling baghouse dust to Big River Zinc
> Company before 1999.  Exhibit "A," Peczkowski deposition at page 18-19.

> 17.  Once Big River Zinc notified American Brass that they were
> not interested in our [baghouse dust] American Brass looked for a new
> outlet.  Exhibit "A," Peczkowski deposition at page 186.

> 18.  American Brass was looking for a buyer who would use the
> material one hundred percent in his process and not generate waste that
> would be landfilled and then thereby cause liability for American Brass.
> Exhibit "B," Robinson deposition at page 27.

---

[6]As noted above, Westmin only admits in part ¶'s 20, 28, 32.  Westmin denies ¶ 30.

     19.  American Brass sought an alternate outlet for baghouse dust. Exhibit "A," Peczkowski deposition at page 187.

     20.  American Brass was marketing baghouse dust.  Exhibit "A," Peczkowski deposition at page 25, lines 19-20.

     21.  American Brass employee Gene F. Peczkowski was responsible for the sale of American Brass' baghouse dust resulting from the manufacturing process, based on approval from their safety group.  Exhibit "A," Peczkowski deposition at page 233.

(Doc. 35, ¶'s 16.-21.).

Between the years 2000-2003, American Brass would sell bag house dust every 6 weeks, but that was not the nature of its business.  (Doc. 35, Ex. A, p. 189).

In January 2003, the FDA notified American Brass that dioxin had been found in the bag house dust it sold to Westmin.  (Doc. 23, Ex. O, p. 8 & doc. 23, ¶ 34.).[7]

The FDA later found dioxin in American Brass' New York facility.  (*Id.*).  It is undisputed that this was the first notification American Brass had that its bag house dust contained dioxin.  (*Id.*, p. 9 & Doc. 23, ¶ 34.),  Before 2003, American Brass did not test its bag house dust for dioxin and Westmin did not request this type of testing.  (*Id.*).  As the Illinois District Court stated:

---

   [7]The District Court for the Central District of Illinois had a case very similar to ours in which Westmin sued American Brass.  Doc. 23, Ex. O.  Our Plaintiff, Nufeeds, was not a party to this action.  The Illinois District Court issued an Opinion on June 24, 2005 and discussed the detailed factual background between Westmin and American Brass.  *Id.*, pp. 2-10.  Many of the same facts in the Illinois case are undisputed facts in our case with respect to Westmin and American Brass.  In fact, some of the deposition transcripts submitted by the parties in our case were taken in the Illinois case.  *See* e.g., Doc. 23, Exs. G, H & I.

Outokumpu Brass was not internally capable of testing for dioxin in the levels indicated by the FDA tests. *Peczkowski Dep.*, p. 83. [Doc. 23, Ex. H]. It is undisputed that, during the course of its sale of bag house dust to Westmin, Outokumpu Brass did not know its bag house dust contained dioxin, and consequently, it never warned Westmin about dioxin in the bag house dust.

When Outokumpu Brass was informed by the FDA about the dioxin in the bag house dust, Outokumpu Brass began a recall of the product. Robinson sent a letter to Jones, dated January 16, 2003, which directed Westmin to cease processing any bag house dust that originated from Outokumpu Brass and to secure the material until Outokumpu Brass could arrange for the return of the material. *Robinson Dep.*, p. 31-32. [Doc. 23, Ex. I]. Outokumpu Brass arranged with a freight carrier to have twenty-eight super sacks and one barrel of bag house dust returned to it from Westmin's facility. *Peczkowski Dep.*, p. 154-156. The material was returned, and Outokumpu Brass subsequently resold it to another customer. *Robinson Dep.*, p. 33. Outokumpu Brass has not refunded Westmin for the bag house dust that was returned. *Jones Dep.*, p. 84-85. [Doc. 23, Ex. G].

(Doc. 23, Ex. O, pp. 9-10).

Further, undisputed material facts in our case are as follows:

31.  The average zinc value of the bag house dust from American Brass was 60-68%. Westmin did not know what constituted the other 30-40%. (Jones Dep., Ex. G, p. 45.).

33.  In July, 2002, American Brass sent a shipment of bag house dust to Westmin that arrived wet. Westmin rejected this shipment and sent it back to American Brass. (Jones Dep., Ex. G, p. 78).

34.  In January 2003, American Brass was notified by the Food and Drug Administration that dioxin had been found in the bag house dust it had shipped to Westmin. This was the first notification American Brass ever received that its bag house dust could or did contain dioxin. (Peczkowski Dep., Ex. H, pp. 28-29.).

> 36.  Nufeeds claims that it received trace mineral premix from
> Westmin which included bag house dust from American Brass.  Nufeeds
> then incorporated this trace mineral premix into its feed, which
> was then sold to Nufeeds customers.  After dioxin was discovered
> in Westmin's trace mineral premix, Westmin was required to
> recall its trace mineral premix, and Nufeeds had to recall the feed
> it had sold.  The damages claimed by Nufeeds and Westmin in
> this case are for the costs associated with this recall, and alleged
> lost profits and loss of goodwill resulting from it. (*See* Exhibit E, pp. 1-3.).

(Doc. 23, ¶'s 31., 33. 34, 36).

Greg Jones of Westmin testified that he went to the American Brass facility and met with Gene Peczkowski, and stated that they talked about American Brass' business and Westmin's business.  He saw three stations (*i.e.* buildings that the bag is setting under the dumps) that the bag house dust was coming out of.  He was aware that the nature of American Brass's business was that they made a copper and brass product.  (Doc. 23, Ex. G, pp. 27-30).  The form of zinc that Westmin bought from American Brass was bag house dust.  Jones stated that this "was the dust that would come off their zinc line as it was fired... .  After it was fired, it would collect in their dust collectors, and then they would put it in their bag house ... . " (*Id.*, p. 25).

Peczkowski testified that American Brass does not manufacture bag house dust; rather, it is a by-product, the result of the process, *i.e.* the casting operation performed by American Brass.  (Doc. 23, Ex. H, p. 85).  He stated that before bag house dust was sold to Westmin, he provided Jones with an analysis of bag house dust and a sample of it before the first shipment was made.  (*Id.*, p. 118).  He stated that he did not know if the bag house dust was suitable for animal feed or not, and that he thus made no representation to Jones that it was or was not suitable for this purpose.  (*Id.*, pp. 118-119).  Jones also stated that prior to buying the bag house dust from American Brass

he asked, he believes Peczkowski, for an analytical on the material and was given it.  (*Id*. Ex. G, p. 33).  Jones did this since he was looking for anything harmful or not appropriate to use in livestock feed.  (*Id*., pp. 33-34).  (*See also* Doc. 23, Ex. O, p. 5).

Plaintiff Nufeeds filed the instant action against both Westmin and American Brass on April 14, 2004, in Susquehanna County Court.  American Brass then removed this action to this Court based on diversity jurisdiction.  (Doc. 1).  In its Complaint, Nufeeds asserts a claim of strict liability under 402A RS 2d of torts against Defendant Westmin (Count I), and strict liability claims against Defendants Outokumpu and American Brass in Counts II and III, respectively.   In Count IV, a breach of contract claim is asserted against Defendant Westmin.  In Count V, breach of implied and expressed warranties against Defendant Westmin are asserted.  Count VI alleges negligence against Westmin.  Count VII asserts a breach of implied and expressed warranties against Defendant Outokumpu.  Count VIII alleges negligence against Defendant Outokumpu.  Count IX asserts a breach of implied and expressed warranties against Defendant American Brass.  The final count, Count X, raises a negligence claim against Defendant American Brass.  As mentioned, Westmin asserts various cross-claims against American Brass. (Doc. 12, pp. 17-25).

As its Losses and Damages, Plaintiff avers as follows:

92.  As a direct and proximate result of the actions and inactions of the defendants, as aforesaid, Dioxin contamination and subsequent recall of its product, Nufeeds incurred losses and damages for which claim is hereby made.

93.  Said losses and damages for which claim is hereby made included significant expenses required to:

 a.  locate all customers who purchased the contaminated cattle feed;

  b.  retrieve all of the contaminated cattle feed from said customers;

  c.  store said contaminated cattle feed for appropriate disposal;

  d.  purchase replacement trace mineral premix from a separate company;

  e.  purchase all other raw materials contained in the Nufeeds product and combine the same with the newly acquired trace mineral premix;

  f.  provide each of Nufeeds's customers equivalent amounts of Nufeeds product that was not contaminated with Dioxin;

  g.  destroy such contaminated material as was on hand;

  h.  incur such other expenses as are disclosed through discovery or proven at time of trial.

94. As a direct and proximate result of the actions and inactions of the defendants, as aforesaid, Nufeeds is entitled to a return of the purchase price of said trace mineral premix paid by Nufeeds to Westmin.

95. As a direct and proximate result of the actions and inactions of the defendants, as aforesaid, Nufeeds suffered loss of profits from the additives to the cattle feed.

96. As a direct and proximate result of the actions and inactions of the defendants, as aforesaid, Nufeeds suffered loss of good will and reputation among its customers for which claim is hereby made.

97. As a direct and proximate result of the actions and inactions of the defendants, as aforesaid, Nufeeds suffered such other losses and damages as are determined through discovery or proven at time of trial.

(Doc. 1, Complaint, ¶'s 92.-97.).

  Defendants American Brass and Outokumpu (hereinafter "American Brass") filed a joint Motion for Summary Judgment. **(Doc. 22).** Both Plaintiff and Defendant Westmin have opposed American Brass' Summary Judgment Motion. The Motion has been briefed and is ripe for disposition.

American Brass argues that Plaintiff's claims against it for negligence and strict liability are barred by the economic loss doctrine. It argues that Plaintiff's claims against it for breach of warranty should be dismissed because it did not make any express warranties to Plaintiff, it is not a merchant of bag house dust, and neither Plaintiff nor Defendant Westmin, to whom American Brass sold the bag house dust, relied upon its judgment in choosing a bag house dust product appropriate to them. (Doc. 22, p. 1). Defendant Westmin filed cross-claims against American Brass (Doc. 12, pp. 17-25), and American Brass also argues that it is entitled to summary judgment for the stated reasons with respect to Westmin's cross-claims as well.

## IV. Discussion.

### 1. *Economic Loss Doctrine*

As stated, American Brass contends that since Plaintiff Nufeeds and Defendant Westmin only suffered economic loss as a result of the alleged defect in its bag house dust, namely, it contained dioxin, their claims against it for negligence and strict liability are barred by the economic loss doctrine. (Doc. 24, p. 3). Plaintiff argues that American Brass' reliance on this doctrine is "simply wrong." (Doc. 33, p. 8). Plaintiff argues that, based on a recent Pennsylvania PA Supreme Court case, *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A. 2d 270 (2005), "economic damages are recoverable by a business concern such as Nufeeds in a tort action." (*Id.*, p. 11). Defendant Westmin, in its opposition Brief to American Brass' Summary Judgment Motion, relies upon and joins in Plaintiff's Brief with respect to the economic loss doctrine argument that American Brass makes herein. (Doc. 31, pp. 2-3). Westmin also cite to *Bilt-Rite*. (*Id.*). American Brass argues that the *Bilt-Rite* Court did not eliminate the economic loss doctrine in Pennsylvania,

as Plaintiff's argument would hold.  (Doc. 37, p. 2).  We agree with American Brass and find that

Plaintiff has overstated the extent of the *Bilt-Rite* decision regarding the economic loss doctrine.

We shall grant American Brass' Summary Judgment Motion with respect to Plaintiff's Counts II and

III (strict liability) and Counts VIII and X (negligence) against American Brass.  We shall also grant

American Brass' Summary Judgment Motion with respect to Westmin's cross-claims Count I

(negligence) and Count III (Strict liability) against American Brass.

The issue presented is whether case law on the economic loss doctrine forecloses Plaintiff

and Defendant Westmin on their claims and cross-claims against American Brass on the theories

of strict liability and negligence.

Since this is a diversity action, we apply Pennsylvania law.  *See Paramount Aviation Corp.

v. Agusta*, 288 F. 3d 67, 69 (3d Cir. 2002).[8]  This Court has diversity jurisdiction pursuant to

28 U.S.C. § 1332, as Plaintiff is a Pennsylvania corporation, Defendant Westmin is an Illinois

corporation, and American Brass Defendants are Delaware corporations. (Doc. 1, ¶'s 1.-4.).[9]  As

stated,  the parties have consented to the jurisdiction of the undersigned pursuant to 28 U.S.C.

§ 636 (c)(1).  (Doc. 13).

The Court in *Air Products and Chemicals, Inc. v. Eaton Metal Products Co.*, 272 F. Supp. 2d

482, 490-91 (E.D. Pa. 2003), stated:

---

[8]Pennsylvania substantive law is utilized in this diversity case as this Court sits in
Pennsylvania.  *See Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  Thus, we shall apply
Pennsylvania law with respect to the economic loss doctrine issue.

[9]A jury trial demand was made by the Plaintiff.

In Pennsylvania, "negligence and strict liability theories do not apply in an action between commercial enterprises involving a product that malfunctions where the only resulting damage is to the product itself." *REM Coal Co. Inc. v. Clark Equipment Co.*, 386 Pa.Super.401, 563 A.2d 128 (1989) (*en banc*).  The economic loss doctrine has been extended outside the realm of products liability to cases involving negligence in the performance of services contracts.  *Ashburner Concrete and Masonry Supply, Inc. v. O'Connor Truck Sales, Inc.*, No. 489, 2001 WL 1808035, at * 3 (Pa.Cm.Pl. Aug. 10, 2001) (*citing Hartford Fire Ins. Co. v. Associated Constr. and Management Corp.*, 2000 WL 424273, at *7 (E.D. Pa. Apr. 19, 2000) (holding that economic loss doctrine bars negligence claims as to engineering services related to roof repair and reconstruction); *Factory Market, Inc. v. Schuller Int'l Inc.*, 987 F.Supp. 387, 397 (E.D. Pa. 1997) (same); *Sun Co., Inc. v. Badger Design & Constructors, Inc.*, 939 F.Supp. 365, 370 (E.D. Pa. 1996) (economic loss doctrine applied to losses from breach of engineering services contract)).

As other courts have noted, Pennsylvania state courts are quite hostile to torts alleging economic losses.  *See Public Servc. Enter. Grp. v. Philadelphia Elec. Co.*, 722 F.Supp. 184, 193 (D. N.J. 1989).  Simply put, Pennsylvania "courts have consistently refused to recognize a cause of action in negligence or strict liability for economic injury unattended by physical injury or damage to real or personal property." *In re TMI Litigation Governmental Entities Claims*, 544 F.Supp. 853, 857 (M.D. Pa. 1982) *vacated and remanded* 710 F.2d 117 (3d Cir. 1983) (vacating and remanding to allow consideration of possible physical injuries).  Indeed, they have even refused to do so when the alleged negligence led to a serious nuclear disaster.  *General Pub. Util. v. Glass Kitchens of Lancaster*, 542 A.2d 567 (Pa. Super. 1988) (ruling on plaintiff's claims arising out of the Three Mile Island incident).

The Third Circuit has predicted that the Pennsylvania Supreme Court would extend the doctrine beyond negligence and strict liability to include even cases of intentional fraud.  *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 675 (3d Cir. 2002).

As stated, Plaintiff relies upon *Bilt-Rite* and asserts that this case supports its position that the economic loss doctrine does not bar its claims for negligence and strict liability against American Brass.  American Brass cites to a recent decision of this very Court in which the *Bilt-Rite* case was

distinguished, and despite this case, this Court found that the economic loss doctrine barred its

Plaintiff's negligence claim.  *See Sovereign Bank v. B.J.'s Wholesale Club, Inc.*, 395 F. Supp. 2d 183

(M.D. Pa. 2005).  (Doc. 37, p. 2).  We agree with American Brass' interpretation of *Bilt-Rite,* and

not Plaintiff's.

This Court in *Sovereign Bank* stated:

> *Aikens's* economic loss doctrine has been followed in subsequent
> cases to bar negligence claims seeking recovery for "economic damages" or
> "losses" unless there has also been physical injury either to a
> person or for property.  *See Spivack v. Berks Ridge Corp.*, 402 Pa.Super.
> 73, 78, 586 A.2d 402, 405 (1990); *Duquesne Light Co. v.
> Pennsylvania American Water Co.*, 850 A.2d 701 (Pa. Super. 2004);
> *General Public Utilities v. Glass Kitchens of Lancaster, Inc.*, 374 Pa.
> Super. 203, 542 A.2d 567 (1988); *Margolis v. Jackson*, 375 Pa.Super. 182,
> 543 A.2d 1238 (1988); *Moore v. Pavex, Inc.*, 356 Pa. Super. 50,
> 514 A.2d 137 (1986); *Adams v. Copper Beach Townhome Communities,
> L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003) ("The Economic Loss Doctrine
> provides that no cause of action exists for negligence that results
> solely in economic damages unaccompanied by physical injury or
> property damage.").

> In opposition, Plaintiff makes two arguments.  First, the
> economic loss doctrine does not apply because it did not suffer
> economic losses; instead it suffered a loss of "real and concrete"
> property, its money.  We reject this argument because in the
> context in which Plaintiff lost its money, payment for replacement
> cards and reimbursement for unauthorized charges, it did suffer
> purely economic losses.  *See Rose Fuel Oil & Heating Co. v. Kia
> Motors of America, Inc.*, 2004 WL 1202901, at *2 (E.D. Pa.) (citing
> *Teledyne Technologies, Inc. v. Freedom Forge Corp.*, 2002 WL
> 748898 (Phila. Ct. Com. Pl. 2002)).

> Plaintiff's second argument is that the *Aikens* economic loss
> rule only applies when the damages are not foreseeable and here
> Fifth Third could easily foresee that if its merchant does not guard
> or delete customer information on the cards, third parties might
> steal the information.  We reject this argument as well.  As noted
> above, *Aikens* did say that one reason for the economic loss

doctrine was the lack of foreseeability of the plaintiff's damages. 348 Pa.Super. at 21, 501 A.2d at 279. But it also decided as a matter of public policy that there would be no right of recovery in negligence for economic losses to prevent anyone "in the economic chain" to sue so that the "economic system" would not be burdened. *Id.* at 21, 501 A.2d at 279. Some cases have cited the lack of foreseeability in applying the rule, *Moore, supra*, 356 Pa. Super. at 54, 514 A.2d at 139, but others have said the public-policy argument is sufficient. *Adams, supra*, 816 A.2d at 305; *Margolis, supra*, 375 Pa.Super. at 185-86, 543 A.2d at 1240; *see also Hemispherx Biopharma, Inc. v. Asensio*, 1991 WL 144109, at * 13 (E.D. Pa.). We agree that the latter argument is an adequate ground for applying the economic loss doctrine.

Plaintiff has also cited *Bilt-Rite Contractors, Inc. v. Architectural Studio*, 581 Pa. 454, 866 A.2d 270 (2005), in support of its second argument. However, that case is distinguishable. In *Bilt-Rite*, the Pennsylvania Supreme Court held that *Restatement (Second) of Torts* 552 (1977) applied to professionals like architects, thus allowing the plaintiff construction company there to sue for the architect's negligent misrepresentations that imposed economic losses on the plaintiff by increasing its costs for constructing a school. One reason the Supreme Court adopted § 552 was that the architect knew that its plans would be used by construction companies on the project and hence any injury was foreseeable.

In allowing the case to proceed, addressing the economic loss doctrine for the first time, the Court did reject the application of the doctrine but only for a claim of negligent misrepresentation. 866 A.2d at 288 ("Thus, we hold that the economic loss rule does not apply to claims of negligent misrepresentation sounding under Section 552."); *see also Samuel Grossi & Sons, Inc. v. United States Fid. & Guar. Co.*, 2005 WL 1522043, at *6 n. 2 (Phila.Ct.Com.Pl. 2005) (applying the economic loss doctrine to bar a negligence claim arising from a construction dispute and distinguishing *Bilt-Rite* because it was a negligent-misrepresentation case). Further, the state superior court has applied the doctrine in a number of cases dealing with other types of negligence claims. *See Aikens, supra*, 348 Pa.Super. 17, 501 A.2d 277; *Spivack, supra*, 402 Pa.Super. 73, 586 A.2d 402; *Adams, supra*, 816 A.2d 301; *Duquesne Light Co., supra*, 850 A.2d 701; *General Public Utilities, supra*, 374 Pa.Super. 203, 542 A.2d 567; *Margolis, supra*, 375 Pa.Super. 182, 543 A.2d 1238; *Moore, supra*, 356 Pa. Super. 50, 514 A.2d 137. We will therefore apply the economic loss doctrine to

bar Sovereign's negligence claim.

Based on *Sovereign Bank*, we find, as American Brass asserts, that *Bilt-Rite* only rejected the economic loss doctrine in Pennsylvania for a claim of negligent misrepresentation. Plaintiff makes no claim of negligent misrepresentation against American Brass in our case. Plaintiff's interpretation of the *Bilt-Rite* case (Doc. 33, p. 13) is overbroad. We also agree with American Brass that the damages Plaintiff here alleges that it suffered due to the dioxin in its cattle feed and due to recalling its product, destroying the contaminated product and replacing the product for its customers with non-contaminated product, are all purely economic losses. We concur with American Brass that the Court in the Illinois case also found that Westmin's damages claimed in that case which are the same as our Plaintiff seeks in the instant case, including product replacement costs, recall expenses and lost profits, were "purely economic losses." (Doc. 24, p. 5 & Doc. 23, Ex. O, pp. 17-18).

While Plaintiff in its Supplemental SMF concludes that the loss of its products due to the dioxin contamination of the baghouse dust constitutes damage to property and not just damage to the baghouse dust itself, we find that Plaintiff's alleged losses are all economic and that Plaintiff does not claim or prove any damage to real or personal property. (Doc. 38, p. 2, ¶ 71.). Further, Plaintiff's conclusion that it suffered property damage is not supported by the evidence. We reject this unsubstantiated argument of Plaintiff, as this Court rejected a similar claim in *Sovereign Bank*.

American Brass also cites to *Samuel Grossi & Sons, Inc. v. USF&G, Inc.*, 2005 Pa. Ct. Com. Pl., 2005 WL 1522043, *6 ,n. 2. (Doc. 46, p. 2). In *Samuel Grossi,* the Court noted:

> This Court finds plaintiff's interpretation of *Bilt-Rite* to exceed the intended scope of that case. *Bilt-Rite* limited its holding to address only the tort of negligent misrepresentation, and was not intended to extend to

all tort claims where there are purely economic losses.
[*Bilt-Rite*, 866 A.2d at 288].

*Samuel Grossi and Sons, Inc. v. USF&G, Inc.*, 2005 WL 1522043, * 6, n. 2.

Plaintiff in its Sur-Reply Brief recognizes this Court's decision in *Sovereign Bank,* as well as the *Samuel Grossi* case.   Nonetheless, Plaintiff contends that *Bilt-Rite's* decision is consistent with the arguments it makes in this case.   (Doc. 39, p. 2).   We disagree with Plaintiff. We find that American Brass is correct in stating that the economic loss doctrine is still valid in Pennsylvania, and that pursuant to this doctrine, Plaintiff's claims against it for negligence and strict liability are barred. (Doc. 46, p. 2).

Based on the foregoing, we find that the economic loss doctrine has not been abrogated in Pennsylvania, as Plaintiff seems to contend.   We find that in light of this doctrine, Plaintiff's claims and Defendant Westmin's cross-claims against American Brass for negligence and strict liability are barred.   Therefore, we shall grant American Brass' Summary Judgment Motion with respect to Plaintiff's claims for negligence and strict liability against it (*i.e.* Counts II, III, VIII & X), and with respect to Defendant Westmin's cross-claims for negligence and strict liability against it (*i.e.* Counts I and III).

*2.  Defendant Westmin's Cross-Claim Based on Negligent Misrepresentation*

American Brass argues that Defendant Westmin cannot maintain its cross-claim against it for indemnification and contribution based on negligent misrepresentation (*i.e.* Count II, Doc. 12, pp. 18-19) since it did not make any representations to Westmin regarding the suitability of its bag house dust.  American Brass also argues that the economic loss doctrine bars Westmin's cross-claim for negligent misrepresentation against it, since the *Bilt-Rite* case limiting the applicability of this

doctrine to such a claim dealt with cases involving architects and design professionals, and those in the business of supplying information to others for pecuniary gain. (Doc. 37, pp. 3-4).

Under Pennsylvania law, to recover on a claim for negligent misrepresentation, as the Court in *Castle v. Crouse*, 2004 WL 257389 at * 7 (E.D. Pa.) stated, the elements for a negligent misrepresentation claim are:

> The elements of a claim for negligent misrepresentation are: "(1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation." *Bortz v. Noon*, 556 Pa. 489, 729 A.2d 555, 561 (Pa. 1999).

American Brass argues that neither Plaintiff nor Westmin can show any evidence that it misrepresented a material fact or that it made any representation regarding the suitability of the bag house dust for use in animal feed. American Brass states that it was Westmin who made the representations to it with respect to the suitability of the bag house dust, and that Westmin assured it that the bag house dust would be tested before Westmin used it in animal feed. (Doc. 24, pp. 7-8). American Brass states that it relied on Westmin's representations about the bag house dust in completing the sale with Westmin. (*Id*.). American Brass acknowledges that Westmin informed it that Westmin would be incorporating bag house dust into animal feed, but argues that it did not make any representation that the bag house dust was suitable for use in animal feed. American Brass also states that there is no evidence that it knew about the possible presence of dioxin in its byproduct. (*Id*.). Indeed, the Illinois District Court stated that it was undisputed that American Brass did not know its bag house dust contained dioxin at the time it sold the baghouse dust to Westmin.

(Doc. 23, Ex. O, p. 21).

Thus, American Brass contends that since it did not make any representation about the suitability of the bag house dust for use in animal feed to either Plaintiff or Westmin, the claim against it for negligent misrepresentation should be dismissed.[10]

Westmin argues, as it did in the Illinois case, that American Brass made four statements regarding the bag house dust enabling it to proceed on its negligent misrepresentation cross-claim. (Doc. 31, pp. 3-5).[11]

We agree with the finding of the Illinois Court on this same issue.   While we apply the law of Pennsylvania as to the elements of Westmin's negligent misrepresentation cross-claim in our case, we are cognizant that under both Illinois law on the elements of this claim, as well as Pennsylvania's law with respect to this claim, an essential element is a false statement of material fact.   Westmin essentially argues in our case, as it did in the Illinois case, that the false statement of material fact that American Brass made to it was that the bag house dust American Brass supplied to it was safe for use in animal feed.   We adopt the reasoning of the Illinois Court and incorporate it herein by reference, since the same statements relied upon by Westmin in the Illinois case are raised in our case, and

---

[10]American Brass made this same argument to the District Court in the Illinois case (Doc. 23, Ex. O, p. 19), and the Court found that Westmin did not identify any false statement of material fact made by American Brass.  The Court thus granted American Brass' summary judgment motion with respect to Westmin's negligent misrepresentation claim.  (*Id.*, p. 19-24).

[11]In the Illinois case, Westmin identified only three false statements it claimed were made by American Brass.  Doc. 23, Ex. O, p. 19.  However, the statements Westmin relied upon in the Illinois case, while only broken down to three, seem to be the same statements Westmin relies upon in our case, although now they are categorized into four statements.

Westmin relies upon the same evidence to support its negligent misrepresentation claim in both cases. (Doc. 23, Ex. O, pp. 20-24).

Once again, we note that in both our case and the Illinois case, it is undisputed that American Brass did not know its bag house dust contained dioxin when it sold this material to Westmin. As American Brass argues, simply because it knew that Westmin was going to be using its bag house dust in animal feed is not proof that American Brass knew about the presence of dioxin in its bag house dust. Westmin in our case, as in the Illinois case, does not point to any evidence that American Brass knew that dioxin was in the bag house dust at the time it was supplied to Westmin. Rather, Westmin only argues that American Brass could have detected dioxin if it tested for it , and that American Brass chose not to test for it. (Doc. 31, p. 4). It is undisputed that dioxin was not listed on the MSDS American Brass provided to Westmin for the bag house dust. Based on Westmin's argument, American Brass should have also tested the bag house dust for other elements not listed on the MSDS and of which it had no knowledge were in it. Further, Westmin itself could have tested for dioxin prior to supplying it to Plaintiff Nufeeds as trace mineral premixes to be used as a cattle feed additive. The simple fact remains that neither American Brass nor Westmin knew, at the time Westmin was being supplied with bag house dust by American Brass, that it contained dioxin. The fact that American Brass did not test for dioxin does not establish that Westmin has stated a viable negligent misrepresentation claim against it.

Therefore, based on the Illinois Court's finding, and based on the same undisputed evidence as in both cases, we find that, under Pennsylvania law, American Brass is entitled to summary judgment with respect to Westmin's cross-claim against it based on negligent misrepresentation (*i.e.,*

Doc. 12, Count II).[12]

   3.    *Claims of Plaintiff and Westmin against American Brass Based on Breach of Implied Warranty of Fitness for a Particular Purpose*

As stated, Plaintiff assets a claim of breach of implied warranty of fitness for a particular purpose as well as breach of implied warranty of merchantability against American Brass (*i.e.* Counts VII & IX).  Likewise, Westmin asserts a cross-claim of breaches of implied warranties against American Brass (*i.e.* Doc. 12, pp. 22-24, Count V).

American Brass argues that the claims of Plaintiff Nufeeds and Westmin based on breach of implied warranty of fitness for a particular purpose must be dismissed since neither of these parties relied upon American Brass' skill or knowledge in selecting its bag house dust.    (Doc. 24, pp. 8-9).  American Brass states that it does not dispute  that it knew Westmin intended to incorporate zinc from its bag house dust into Westmin's mineral premixes.  However, American Brass contends that it did not have knowledge of Plaintiff Nufeeds or of Nufeeds' intentions to use the trace mineral premix it purchased from Westmin in Nufeeds' products sold as cattle feed.  (*Id.*, p. 9).  In fact, in its Complaint, Plaintiff Nufeeds alleges that in December 2002, it ordered 17 tons of trace mineral premix from Westmin to use in products Nufeeds sold as cattle feed, and that Westmin knew and had reason to know that the trace mineral premix Nufeeds was buying would be used by Nufeeds

---

[12]While Plaintiff argues that the *Bilt-Rite* case would preclude the applicability of the economic loss doctrine to bar Westmin's claim for negligent misrepresentation against American Brass (Doc. 39, p. 4), we do not base our decision on this doctrine.  Rather, as discussed, we find that Westmin has failed to establish an essential element of its negligent misrepresentation cross-claim against American Brass, namely that American Brass did not make any false statement of material fact.  Thus, we find that American Brass it entitled to summary judgment on this cross-claim of Westmin.

in its cattle feed products.  (Doc. 1, ¶'s 28.-29.).  Plaintiff does not allege that American Brass knew that the zinc from its bag house dust would be incorporated by Nufeeds into its cattle feed product.

American Brass also argues that there is no evidence that it had reason to believe that Westmin was relying on its (American Brass') skill and judgment regrading the use of its bag house dust.  American Brass further argues that there is no evidence that either Westmin or Plaintiff Nufeeds actually relied upon its (American Brass') skill and judgment.

A claim of breach of implied warranty of fitness for a particular purpose arises by operation of law.   As the Court in *Parkinson v. Guidant Corp.*, 315 F.Supp.2d 741, 752-753, stated:

> "claims for breach of the implied warranties of merchantability and fitness for particular purpose [arise] under Pennsylvania Uniform Commercial Code §§ 2314 and 2315.  Unlike an express warranty, which arises out of the representations or promises of the seller, the implied warranties of merchantability and fitness for particular purpose arise by operation of law. *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992)."

In *Whitson v. Safeskin Corp., Inc.* 313 F.Supp.2d 473, 476 (M.D. Pa. 2004), this Court stated:

> Plaintiffs contend that the defendants have breached their implied warranties of fitness and merchantability under the Uniform Commercial Code (UCC).  The UCC, as adopted in Pennsylvania, provides that:
>
> a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind . . .  Goods to be merchantable must be at least such as:
>
> (1) pass without objection in the trade under the contract description;
> (2) in the case of fungible goods, are of fair average quality within the description;
> (3) are fit for the ordinary purposes for which such goods are used;

> (4) run, within the variations permitted by the agreement, of
> even kind, quality and quantity within each unit and among
> all units involved;
> (5) are adequately contained, packaged, and labeled as the
> agreement may require; and
> (6) conform to the promises of affirmations of fact made on
> the container or label if any.

> *See* 13 Pa.C.S. § 2314(a); (b).

American Brass and Plaintiff agree that in Pennsylvania, warranty principles are codified in Pennsylvania's version of the U.C.C., and that 13 Pa. C.S.A. § 2315 applies to implied warranty of fitness for a particular purpose.  (Doc. 24, p. 8 & Doc. 33, p. 16).  13 Pa. C.S.A. § 2315 provides as follows:

> Where the seller at the time of contracting has reason to know:

> (1) any particular purpose for which the goods are required; and
> (2) that the buyer is relying on the skill or judgment of the seller
> to select or furnish suitable goods;
> there is unless excluded or modified under section 2316 (relating to
> exclusion or modification of warranties) an implied warranty that the
> goods shall be fit for such purpose.

We agree with American Brass, and as the Court in *Borden v. Advent Ink Co.*, 701 A. 2d 255, 258 (1997), stated:

> The implied warranty that goods shall be fit for a particular purpose
> exists, under the UCC, where the seller at the time of contracting
> has reason to know of such purpose and of the buyer's reliance upon the
> seller's skill or judgment to select or furnish goods that are suitable for
> such purpose.  *See* 13 Pa. C.S.A. § 2315.

American Brass points out that the District Court in the Illinois case again ruled in its favor on the stated argument, and found, under the exact same situation as before us, that as a matter of law American Brass could not be held liable under a claim for breach of implied warranty for fitness for

a particular purpose. (Doc. 24, p. 10). The Illinois Court, applying the same facts as are in our case to an Illinois law regarding the elements of a claim of breach of implied warranty of fitness for a particular purpose, which is essentially the same as Pennsylvania's law, found that Westmin could not prevail against American Brass on such a claim. (Doc. 23, Ex. O, pp. 41). The Illinois Court found that there was no genuine issue of material fact that American Brass did not have reason to know that Westmin was relying upon its skill to furnish a suitable good for use in animal feed. The Illinois Court specifically stated the "While [American Brass] is certainly familiar with the brass making process, prior to dealing with Westmin, it had no experience selling bag house dust for use in the animal feed industry." (*Id.*, p. 41).

The facts in our case are the same as in the Illinois case, and the relevant Pennsylvania law is substantially the same as the Illinois law. However, our Plaintiff is Nufeeds and not Westmin, and Westmin bought the bag house dust directly from American Brass and then sold it to Plaintiff Nufeeds. Thus, in the Illinois case, there was a direct link between Westmin and American Brass, and the Court in that case found that Westmin failed to establish a genuine issue of material fact on the reliance issue with respect to its breach of implied warranty of fitness for a particular purpose claim against American Brass. (*Id.*). It can be said with even more certainty that if Westmin, the direct purchaser of bag house dust from American Brass, was found by the Court as failing to establish that American Brass had reason to know that Westmin was relying on its (American Brass') skill to furnish suitable goods, then all the more reason to find that our Plaintiff (Nufeeds), which purchased the trace mineral premix from Westmin, cannot show that American Brass had reason to know Nufeeds was relying on American Brass's skill to furnish a suitable good for use in its (Nufeeds') animal feed. That

is to say, if the Illinois Court has found, based on the same evidence as in our case, that Westmin did not produce any evidence that it relied upon American Brass' skill or judgment regrading the use of bag house dust for animal feed, then even more so, our Plaintiff, which bought the trace mineral premix from Westmin (not from American Brass) cannot prove that it (Nufeeds) relied upon on American Brass' skill or judgment with respect to American Brass' bag house dust. As American Brass states in its Brief (Doc. 24, p. 9), Westmin relied on its own experience based on its prior purchases of bag house dust from other brass manufacturers and its own testing of the bag house dust it bought from American Brass, in determining it would use the bag house dust in its product which it then sold to Plaintiff Nufeeds. As American Brass also states (*Id*.), Westmin advised American Brass that it would test each shipment of bag house dust it bought from American Brass before using it. In any event, there is no evidence that Plaintiff Nufeeds or Westmin relied upon American Brass to choose and provide them with bag house dust appropriate for use as animal feed with respect to the products of both Westmin and Nufeeds.

Plaintiff Nufeeds contends that whether Westmin relied upon American Brass to select a suitable product for use in animal feed is a question of material fact. (Doc. 39, p. 7). We disagree and as stated, in our case, we find no material factual dispute with respect to the reliance issue, an essential element of Plaintiff's breach of implied warranty of fitness for a particular purpose claim against American Brass. At best, the evidence may show that Plaintiff Nufeeds could have relied on Westmin's skill and judgment, especially since Westmin had bought bag house dust from other brass manufacturers prior to buying it form American Brass, and used it in its (Westmin's) products. We do not find that Plaintiff Nufeeds points to any evidence that either it or Westmin relied on American

Brass' skill or judgment to use bag house dust in their products.

Westmin, in its Brief, states states that American Brass knew that the bag house dust it was to sell Westmin would be used in animal feed. (Doc. 31, p. 5). As stated, American Brass does not dispute this fact. (Doc. 24, p. 9). However, as discussed, we do not find that there is a factual dispute, as the Illinois Court also found, that Westmin could show that it relied on American Brass' skill and judgment to use the bag house dust in Westmin's animal feed products. American Brass was involved in the brass manufacturing process. We find no evidence that American Brass had any experience in selling bag house dust for use in animal feed products before selling it to Westmin. Westmin, on the other hand, had previously bought bag house dust from other brass manufacturers to use in its product. Thus, while it is undisputed that American Brass knew Westmin was going to use the bag house dust in its animal feed product, there is simply no evidence to create a genuine issue of material fact as to whether Westmin was relying on American Brass' skill and judgment in its (Westmin's) decision to use the bag house dust in its product. Rather, as discussed, the evidence shows that Westmin was relying on its past experiences in purchasing bag house dust from other brass manufacturers for many years and using their bag house dust in its products with good results. As the Illinois Court stated, "Westmin provides no direct evidence that it relied on [American] Brass to furnish suitable goods." (Doc. 23, Ex. O, p. 40).

Further, both Plaintiff and Westmin argue that, based on the MSDS American Brass provided Westmin with each shipment of bag house dust, which did not show any dioxin in the material, they could rely on American Brass' skill and judgment to select and provide them with a suitable material for their animal feed products. As American Brass argues, and as found by the Illinois Court (Doc.

23, Ex. O, p. 41), the MSDS was not a complete analysis of the bag house dust.  In fact, the MSDS ,while listing various components of the bag house dust, specifically stated that "This may not be a complete list of components, however, other regulated materials would not be expected to reach 1% of weight."  (Doc. 37, Ex. B, section 9.).

Accordingly, we shall grant American Brass' Motion for Summary Judgment with respect to Plaintiff's claims (Counts VII and IX, in part) and Westmin's cross-claim (Doc. 12, Count V, in part) for breach of implied warranty of fitness for a particular purpose.

*5. Claims based on Implied Warranty of Merchantability*

American Brass argues that the claims of Plaintiff and the cross-claim of Westmin based on implied warranty of merchantability should be dismissed, since it was not a merchant of bag house dust.  (Doc. 24, p. 10).  American Brass states that under 13 Pa. C.S.A. § 2104, to be liable for a breach of implied warranty of merchantability, the seller must be one who "deals in goods of the kind."  (*Id*.).  It then argues that it is in the business of manufacturing brass and not bag house dust. As stated, Peczkowski testified that American Brass does not manufacture bag house dust, rather, "Baghouse dust is a by-product" of its brass manufacturing process.  (Doc. 23, Ex. H, p. 85).  Thus, American Brass contends that since it is not in the business of bag house dust, it cannot be found to have breached any implied warranty of merchantability with either Westmin or Plaintiff because no implied warranty was created when it sold the bag house dust.

13 Pa. C.S.A. § 2314(a) provides in part:

**§ 2314.  Implied warranty; merchantability; usage of trade.**

**(a) Sale by merchant.**  Unless excluded or modified (section 2316), a warranty that the goods shall be merchantable is implied in a

contract for t heir sale if the seller is a merchant with respect to goods of that kind.

13 Pa. C.S.A. § 2104 defines merchant as follows:

**"Merchant."**  A person who:

deals in goods of the kind; or

otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.

American Brass states, that by definition, it is not a merchant of bag house dust.  It states that it is a brass manufacturer that merely sold bag house dust as a by-product of its brass manufacturing process, and that this sale accounted for less than 1/10 of 1% on its monthly sales.  (Doc. 24, p. 11). It states that it had no expertise in bag house dust, and that it had no knowledge as to the use of bag house dust in animal feeds.  Thus, since it states that it was not a merchant of bag house dust, there did not exist an implied warranty of merchantability between it and Westmin, and between it and Plaintiff.

Plaintiff argues that the mere fact that American Brass sells more brass than bag house dust does not mean that it cannot be a merchant of bag house dust.  Plaintiff states that American Brass had an ongoing business of selling bag house dust, as is demonstrated in its (Plaintiff's) SMF.  Plaintiff states that American Brass has been marketing and selling bag house dust for many years, and that it has sold it to various buyers.  (Doc. 33, p. 17).  Plaintiff also points out that American Brass made this same argument in the Illinois case, and that the District Court in Illinois rejected it.

Indeed, the Illinois Court considered American Brass' argument that it was not a merchant of bag house dust and that it was entitled to summary judgment on Westmin's claim that it breached the  implied warranty of merchantability.  (Doc. 23, Ex. O, pp. 34-36).  The Illinois Court found that notwithstanding the fact that American Brass was primarily a merchant of brass, and notwithstanding the fact that it did not manufacture bag house dust, it was still found to be a merchant of bag house dust.  (*Id*.).  American Brass made the same argument to the Illinois Court under an Illinois law substantially the same the Pennsylvania law, and claimed that it was not a merchant of bag house dust, since this material was only a by-product of its brass manufacturing process, since the sale of bag house dust made up only less than 1/10 of 1% of it monthly sales, and since it had no special expertise in the use of bag house dust for animal feed.  (*Id*., p. 35).  The Illinois Court found under the identical undisputed facts as we are presented, that American Brass was "clearly a merchant of bag house dust, even if it lacks special knowledge or skill relating to the product.  [American] Brass clearly sells bag house dust."  (*Id*., p. 36).  There was evidence that the sale of bag house dust from American Brass to Westmin was not an isolated sale, and that it had sold this material to other customers as well.  Thus, based on the same undisputed facts as in the Illinois case, and based on Pennsylvania's similar law and definition of merchant, we too find that American Brass is a merchant of bag house dust.  We agree with Plaintiff that there is sufficient evidence for it to proceed on its claim (*i.e.* Counts VII and IX, in part), as well as Westmin's cross-claim (*i.e.* Count V, Doc. 12, in part) that American Brass breached its implied warranty of merchantability.  (Doc. 33, p. 18).

6.      *Waiver of any Implied Warranties Due to Westmin's Testing of the Bag House Dust Samples*

As its final argument, American Brass contends that since Westmin undisputedly conducted a test of a sample of its bag house dust before it purchased the dust for use in its animal feed product, including testing for zinc content and cadmium, and failed to discover the presence of dioxin which could have been discovered by a test costing less than $500, Westmin waived any implied warranties. (Doc. 24, p. 12).   American Brass bases its argument on 13 Pa C.S.A. § 2316.   This section provides that if a buyer examines the goods, then any implied warranties are waived, and states:

> (2)  When the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him.

13 Pa. C.S.A. § 2316(c)(2).

Plaintiff argues that the fact that Westmin tested American Brass' bag house dust to determine if its zinc content was sufficient for Westmin's use of it in Westmin's animal feed product, is not a test of any other component contained in the bag house dust.   (Doc. 33, p. 19).   Plaintiff states that since Westmin was only concerned about zinc content of American Brass' bag house dust and only tested the bag house dust for this material, this limited testing did not waive any implied warranties that American Brass made with respect to this bag house dust.   Plaintiff also states that American Brass' argument as to the low cost of testing its bag house dust for dioxin cuts both ways, since this means that American Brass could have also easily tested its bag house dust before it sold it to Westmin for use in its animal feed, a use American Brass was undisputedly aware of when it made the sale to Westmin.   (*Id*.).   Plaintiff also states that even if Westmin is found to have waived any implied

warranties as against American Brass since it (Westmin) did the testing of the bag house dust sample before it purchased this material, that since privity has been eliminated in Pennsylvania for breach of warranty claims, "that the manufacturer of a product is, in essence, a guarantor of the product." (*Id.*, pp. 19-20).  Plaintiff states that it, as a "downstream" buyer of the bag house dust, should not be held to any implied warranty waiver based on the testing of the intermediate buyer (Westmin) who sold it the material.  (*Id.*, p. 20).

In its Reply, American Brass states that Plaintiff has misstated the Pennsylvania law with respect to its adoption of §2316 of the U.C.C.  (Doc. 37, pp. 7-8).  It argues that based on Pennsylvania law, and the UCC, that since Westmin tested the bag house dust before any sales occurred, and since Westmin then sampled each shipment of bag house it received from American Brass, that Westmin assumed the risk of all defects which may have been in the bag house dust, including dioxin contamination.  (Doc. 37, p. 8).  American Brass states that there is no need for an implied warranty in such circumstances as here, since the sample itself represents the quality of the product to be sold.  American Brass states that Plaintiff Nufeeds' remedy is for damages as against Westmin, and that Plaintiff cannot create a new implied warranty where it has already been waived by Westmin, and Westmin has already assumed the risks of any defects.  (*Id.*, pp. 8-9).

Plaintiff in its Sur-reply Brief, permitted by the Court, argues that it has not misstated Pennsylvania law regarding the waiver of the implied warranties by a buyer who inspects and samples a product prior to purchasing it.  (Doc. 39, pp. 7-8).  Plaintiff also points to the finding of the Illinois Court, under Illinois law, that a genuine issue of material fact existed as to whether Westmin's testing of the bag house dust waived the implied warranties.  The Illinois Court discussed this issue under

33

Illinois law and stated:

> Prior to selling bag house dust to Westmin, Outokumpu Brass
> provided Westmin with a sample of the material for testing.
> Westmin tested a sample of the bag house dust in February 2000.
> [FN8].  However, viewing the evidence in the light most
> favorable to Westmin, a material issue of fact exists as to whether
> Westmin's act of testing the sample in February 2000 bars it
> from recovering under an implied warranty theory.  The Commentary
> to § 316 explains:
>
>> The particular buyer's skill and the normal method of
>> examining goods in the circumstances determine what
>> defects are excluded by the examination . . .  A professional
>> buyer examining a product in his field will be held to have
>> assumed the risk as to all effects which a professional in
>> the field ought to observe, while a nonprofessional buyer
>> will be held to have assumed the risk only for such defects
>> as a layman might be expected to observe.
>
> Id., cmt. n. 8.  In the present case, there is no evidence as to whether
> a professional in the animal feed premix industry should have
> discovered the dioxin in the bag house dust.  Indeed, the record
> reveals that very few laboratories in the United States were capable
> of testing to the degree necessary to reveal dioxin concentrations
> similar to those at issue here.  Moreover, in addition to its own
> testing, Westmin had asked Outokumpu Brass to test the bag house
> dust, and Jones expected that test to include anything that might
> be harmful or inappropriate for use in animal feed.  Outokumpu
> Brass responded with only a partial chemical analysis of its bag
> house dust.  A triable issue of fact exists as to whether a
> professional in the animal feed industry should have discovered the
> dioxin contamination.  Therefore, Defendants cannot prevail under
> this theory on summary judgment.
>
> [FN8] Westmin also tested each shipment of bag house dust upon
> arrival.  However, the commentary to § 316 makes clear that
> "examination" as used in the section is not synonymous with
> inspection before acceptance or at any time after the contract
> has been made.  810 ILCS 5/2-318, cmt. n. 8.

(Doc. 23, Ex. O, pp. 27-28).

Plaintiff concludes in it Sur-reply Brief that, based on the Illinois Court's finding and Westmin's present Brief, that the inspection issue, *i.e.* whether a professional in the animal feed industry should have discovered dioxin in the bag house dust, is a genuine issue of material fact barring the waiver of all implied warranties of American Brass in this case.  (Doc. 39, p. 7).

In its Brief in reply to Plaintiff's Sur-reply Brief, the final word on this matter, American American Brass argues that under the Third Circuit case of *Henry Heide, Inc. v. WRH Products Co., Inc.*, 766 F. 2d 105 (3d Cir. 1985), a Plaintiff's testing of a product prior to purchase voided any implied warranties.  (Doc. 46, p. 3).

American Brass states that the case relied upon by Plaintiff (Doc. 39, p. 8), namely *Moscatielo v. Pitts. Contractors Equipment Co.*, 595 A. 2d 1198 (Pa. Super. 1991), is not even on point with our case since it did not involve the testing of a product before purchase as our case does, and does not even refer to U.C.C § 2-316.  (Doc. 46, p. 4).   In fact, American Brass states that the *Moscatillo* case did not have the same facts as our case since there was no testing of the paving machine at issue in that case by any party prior to the purchase of it.  (*Id*.).  Thus, American Brass reiterates that under the U.C.C. as adopted by Pennsylvania law, any implied warranty between it and Westmin, and between it and Nufeeds was waived in this case, since Westmin undisputedly tested the bag house dust prior to purchasing it, and assumed the risk of any defects that were in the sample and should have been discovered.  (*Id*.).

Westmin argues that it did not waive all implied warranties under U.C.C. § 2-316 (Doc. 31, p. 7) by testing the bag house before it purchased it from American Brass, since it only tested the bag house dust for zinc content.  Westmin seemingly indicates that it only assumed the risk as to the zinc

35

content of American Brass' bag house dust since that was the only purpose of its testing.   Westmin states that it used bag house dust only as the ingredient that constitutes the zinc in its trace mineral premix it produces.  It points to the testimony of Jones who stated that Westmin tested the bag house dust prior to use to solely determine the percentage of zinc content in it and occasionally to determine the presence of other metals.  (*Id*., p. 8).  (*See* Doc. 23, Ex. G, p. 39).  Jones stated that each and every load of bag house dust Westmin received got tested for zinc value.   (*Id*.).   Jones stated that they were looking for a specif zinc value of about 60-65 % for the bag house dust, and that they did not want to have a product with too much zinc value in it.  (*Id*., p. 41, 43).  He stated that if the bag house dust had a zinc value making it unusable for zinc content in its animal feed, Westmin would still use it as a flow agent to help materials flow through its feed additive system.  (*Id*., p. 42). He stated that Westmin only wanted testing for zinc content, and that it was only concerned about zinc value.  (*Id*., pp. 44-45).  He stated that the bag house dust was utilized as a zinc, and that the zinc goes into the trace mineral product premix it sold.  (*Id*., p. 45).   Westmin states that it relied upon American Brass to test the bag house for other materials such as harmful contents or contents not appropriate for use in animal feed. (Doc. 31, p. 8).  Westmin states that its testing did not permit the discovery of dioxin and was not intended to determine whether it would enter into an agreement to buy bag house dust from American Brass.  (*Id*.).  Westmin states that its testing was only done to determine how the bag house dust would be used by it, *i.e.* for its zinc content in its animal feed or as a flow agent.  (*Id*., pp. 8-9).

　　　We agree with Plaintiff and Westmin that there is a factual dispute as to whether the testing on the bag house dust by Westmin prior to buying it should have included a test for dioxin or

whether it was only required to test it for zinc content as that was all Westmin was interested in.  As Westmin has shown, it was going to us American Brass' bag house dust regardless of zinc content, and it only tested the bag house dust to determine if it would be used in its animal feed or as a flow agent. Therefore, we shall deny American Brass' Summary Judgment Motion with respect to the waiver of all implied warranties, including the implied warranty of merchantability claims of Plaintiff and Westmin.

Accordingly, the Motion for Summary Judgment of American Brass will be granted in part and denied in part.  We shall grant American Brass' Summary Judgment Motion with respect to Plaintiff's claims for negligence and strict liability against American Brass (*i.e.* Counts II, III, VIII & X), and with respect to Defendant Westmin's cross-claims for negligence and strict liability against American Brass (*i.e.* Doc. 12, Counts I and III).  We also find that American Brass is entitled to summary judgment with respect to Westmin's cross-claim against it based on negligent misrepresentation (*i.e.* Doc. 12, Count II).   We shall grant American Brass' Motion for Summary Judgment with respect  to Plaintiff's and Westmin's claims  for breach of implied warranty of fitness for a particular  purpose (Plaintiff's Count VII & IX, in part, and Westmin's Count V, in part).  We shall deny American Brass' Motion with respect to Plaintiff's and Westmin's claims for breach of implied warranty of merchantability

(Plaintiff's Count VII & IX, in part, and Westmin's Count VI, in part).  Finally, we shall deny American Brass' Summary Judgment Motion with respect to the waiver of all implied warranties, including the implied warranty of merchantability claims of Plaintiff and Westmin.

An appropriate Order and Judgment will issue.


s/ Thomas M. Blewitt
**THOMAS M. BLEWITT**
**United States Magistrate Judge**

**Dated: April 17, 2006**